433 So.2d 328 (1983)
Melvin N. OATIS, Plaintiff-Appellant,
v.
CATALYTIC, INC., Olin Corporation, et al., Defendants-Appellees.
No. 82-775.
Court of Appeal of Louisiana, Third Circuit.
May 25, 1983.
Rehearings Denied July 14, 1983.
*329 Baggett, McCall, Singleton, Ranier & Ieyoub, P.C., Drew Ranier, Lake Charles, for plaintiff-appellant-appellee.
Jones, Tete, Nolen, Hanchey, Swift & Spears, William B. Swift, Lake Charles, for defendant-appellee-appellant.
*330 Woodley, Barnett, Cox, Williams & Fenet, James Williams, Lake Charles, for defendants-appellees.
Before DOMENGEAUX, FORET and CUTRER, JJ.
CUTRER, Judge.
Melvin N. Oatis was seriously injured when he inhaled toxic phosgene vapors while working at a chemical plant in Calcasieu Parish, Louisiana, owned by Olin Corporation.[1] Oatis sued Catalytic, Inc., the designer of the plant, urging two separate bases for recovery under Civil Code art. 2315; i.e., ordinary negligence and the strict liability of a manufacturer of a product. A jury found in favor of Catalytic, Inc., and a judgment was rendered dismissing Oatis' principal demand and the intervention of Olin Corporation. Oatis and Olin Corporation appealed. We affirm.
In the early 1970's, Catalytic, Inc. (Catalytic) was hired by Olin Corporation (Olin) to design, engineer and supervise the construction of a toluene di-isocyanate (TDI) plant. Olin already owned a TDI plant located in Ashtabula, Ohio. Catalytic, with input from Olin, was to improve and enlarge the basic design successfully used at Ashtabula. The Lake Charles TDI unit was constructed between 1970 and 1972; the plant began production in late 1972 or early 1973.
One of the raw materials used in the TDI production process is phosgene. Phosgene is a very toxic chemical; experts at trial indicated that phosgene could be lethal to humans when inhaled in concentrations as low as four or five parts per million.
Melvin Oatis was employed by Olin in 1979. On March 24, 1980, while working as an instrument maintenance man, Oatis inhaled a quantity of phosgene and ultimately became permanently and totally disabled. Oatis' injuries included paralysis and an almost total loss of communication skills (both speech and writing).
As of the date of trial Olin had paid over $71,000.00 in medical expenses for Oatis and was paying him $149.00 per week in workers' compensation benefits. Olin has continued to pay compensation benefits since the trial. This was the basis for Olin's intervention.
At trial Oatis argued that Catalytic negligently designed Olin's TDI plant and that this negligence caused his injuries.
The jury heard testimony from Olin employees who were at the scene when Oatis was exposed to the phosgene. Also, both sides presented expert testimony and there was a conflict as to whether the TDI unit was defective. The following interrogatories were submitted to the jury and answered as indicated:

"1.

"Was Melvin N. Oatis injured as a result of a defective design of equipment by Catalytic at Olin Corporation on March 24, 1980?"

Jury response to Interrogatory Number 1: "No"

"2.

"Was the injury of Melvin N. Oatis caused by his own fault, that is, assumed the risk?"

Jury response to Interrogatory Number 2: "Yes"

"3.

"Was the injury to Melvin N. Oatis caused by the fault of a third party?"
Jury response to Interrogatory Number 3: "No"

"4.

"Was (sic) Melvin N. Oatis' injuries caused by negligence of Catalytic, Inc.?"

*331 Jury response to Interrogatory Number 4: "No"

"5.

"Was Melvin N. Oatis contributorily negligent?"

Jury response to Interrogatory Number 5: "Yes"

"6.

"What were the damages, if any, sustained by Melvin N. Oatis as a result of the occurrence of March 24, 1980?"
Jury response to Interrogatory Number 6: "-0-"
Pursuant to these answers the trial court granted judgment in favor of Catalytic dismissing Oatis' demands with prejudice at his cost. Olin's intervention was likewise dismissed. Oatis and Olin moved for a new trial and, after a hearing, these motions were denied. Oatis and Olin appealed. We affirm.
On appeal it is urged that the jury's answers to the interrogatories were inconsistent and that a new trial should be granted. Oatis also contends that the answers to the interrogatories are contrary to the law and evidence and that the trial court erred in two instances in its charge to the jury. Oatis' arguments will be considered in the order presented above.

INCONSISTENT VERDICTS
Oatis argues that the jury was confused and misunderstood the jury charge as evidenced by their answers to the interrogatories. This argument is without merit.
We find that the jury's answers to the special interrogatories submitted in this case are not inconsistent with each other nor with the judgment of the trial court. Each answer of the jury supports the judgment in favor of Catalytic. While it may have been superfluous for the jury to decide that Oatis "assumed the risk" after deciding his injuries were not caused by any defect, these answers are not inconsistent. Similarly, the determination of Oatis' own negligence became extraneous once the jury determined that Catalytic was not negligent. Though extraneous, the jury's answer is not inconsistent.
This court considered a similar contention of inconsistency in Ainsworth v. Bituminous Cas. Corp., 379 So.2d 1187 (La.App. 3rd Cir.1980), writs den., 391 So.2d 1233, 1234 (La.1980). There, the jury initially determined the defendant was not negligent. Next, the jury found that the plaintiff was negligent and further that defendant did not have the last clear chance to avoid the accident. Plaintiff argued on appeal that the jury's answer to the last clear chance question was evidence of their confusion in light of the jury charge which instructed them that last clear chance need only be considered if both parties were found negligent. In resolving this argument, this court said:
"[C]ertainly, it was superfluous for the jury to consider the question of whether the defendant, Nichols, had the last clear chance to avoid the accident after it had answered the first interrogatory directed to them to the effect that Nichols was not negligent. However, the two answers are consistent. Hence, no confusion is apparent on the fact of the answers to the interrogatories. The superfluous action of the jury could have been avoided if the interrogatories had been propounded with instructions not to proceed to answer any further interrogatories if the jury found the defendant not to have been guilty of negligence which was a cause of the accident. The failure to do so we consider of no moment and to be harmless error...."
Ainsworth v. Bituminous Cas. Corp., supra, at 1190.
The above quotation is applicable to the instant case. The answers of the jury, to the special interrogatories submitted, are not inconsistent and are in accord with the judgment of the trial court.

VERDICTS CONTRARY TO LAW AND EVIDENCE
Oatis argues on appeal that the jury's answers to the interrogatories are *332 "contrary to law" and not supported by the evidence. The law of products liability in this state is well established and may be succinctly stated; a manufacturer of a product may be held liable for injuries caused by their product, without any particular act of negligence being proven, if a plaintiff shows (1) there was a defect in the product; (2) that the product was in normal use; (3) that the product was unreasonably dangerous in that use; and (4) that the plaintiff's injuries were caused by the defect. Defenses to a products liability claim include the negative of any one of the four items above plus assumption of the risk by plaintiff. See: Weber v. Fidelity & Casualty Insurance Co., 250 So.2d 754 (La.1971), and its progeny.
Oatis' position at trial and on appeal has been that the Olin TDI unit was defective because of the presence of a particular device used to measure the amount of phosgene in a certain tank. For process purposes it was necessary that the amount of phosgene be determined. In the design phase of this project Catalytic, in consultation with Olin, considered various alternative methods of measuring the phosgene before recommending the use of a "Masoneilan level control" ("level trol"). Olin had successful experience with this type instrument at its Ashtabula plant in an identical application and approved Catalytic's suggestion that the level trol be used in the Lake Charles TDI plant.
Oatis' expert felt the presence of the level trol made the TDI unit "defective" because, at the time Catalytic designed Olin's plant, other "safer" methods of measuring the phosgene were available. Mr. Leslie P. Williams, Oatis' expert on safety engineering, felt that the level trol was an inappropriate choice of measuring devices because this type of device was invasive of the process; it required phosgene to be taken out of the process lines and actually be inside of the device in order to take measurements. Williams said the same information, the amount of phosgene present, could have been obtained with either non-invasive measuring devices or with invasive measuring devices which required the presence of less phosgene. Williams also felt that the decontamination system designed by Catalytic to clean out the level trol so that routine maintenance could be performed was inadequate and that local hood-type ventilators should have been provided to insure that any leakage of phosgene would have been quickly and safely removed.
Catalytic defended the level trol as an appropriate application of instrumentation in this case. Two experts in instrumentation engineering, Mr. Steve Ranson and Mr. George Meiners, were called to testify by Catalytic. Both Ranson and Meiners worked on Catalytic's original design of the TDI unit. Their testimony explained the various alternatives considered by Catalytic before the level trol in question was chosen and the reasons why Catalytic made the choice it did. Factors considered by Catalytic in its choice of the Masoneilan level control included Olin's prior successful experience with this device in an identical application and the metallurgical properties of monel, the material of which this level trol is constructed, to withstand the temperatures and pressures present in the process involved without absorbing phosgene. Ranson and Meiners also explained why the alternatives mentioned by Williams were not chosen and they were equally as adamant in their opinions that the level trol was appropriate as Williams was in his opinion that it was inappropriate.
Regarding Williams' criticism of the decontamination system used at the time of Oatis' accident, Ranson discussed the decontamination system originally designed by Catalytic. Knowing that routine maintenance would have to be performed on the level trol, and aware of the lethal nature of phosgene, Catalytic's design engineers chose to design a procedure which effectively cleared not only the level trol but also all other process equipment around the level trol. The evacuation or decontamination system used steam to force the phosgene out of the area and clean out the equipment. After the TDI unit began production and the originally designed evacuation *333 system was used certain changes were made. Olin opted to use a less extensive decontamination procedure, where only the instrument being worked on was decontaminated, and this procedure was in use when Oatis was injured. Concerning Williams' suggestion that local ventilation hoods should have been used Meiners indicated that, to his knowledge, such hoods, though possibly desirable, were never used in the chemical industry.
All of the expert testimony reviewed above goes directly to the threshold question of whether a defect was present in the TDI unit and both Oatis and Catalytic, in their briefs to this court, make arguments based on a purported jury finding that a defect did not exist. However, by reviewing the interrogatories submitted to the jury it is clear that the jury was never asked to decide if the TDI unit was "defective." We have undertaken the above review to assure ourselves that the evidence before the jury supported the decisions made. Had the jury decided that no defect existed we find that such a decision is supported by the evidence. On the other hand, assuming the jury made a finding that a defect existed, the finding that Oatis' injuries were not caused by a defect is likewise supported by the evidence.
There was no dramatic failure of the unit designed by Catalytic. A part of the unit, the level trol, required routine maintenance just as it had on several previous occasions over the seven year life of the plant. During the maintenance operation the integrity of the closed process equipment was violated by Oatis when he prematurely loosened certain bolts on the level trol and a quantity of phosgene escaped, causing Oatis' injuries.
As we stated earlier, the jury's determination that Oatis assumed the risk of his injury was superfluous; however, that determination is also correct. Two Olin employees, Ralph Vincent and James Vincent, who were at the scene of the accident, testified at trial. Each indicated that there were problems with the decontamination of the level trol. Oatis was present when these problems were discussed and he was aware that decontamination procedures were ongoing. Ralph Vincent, a specialist with pneumatic instruments such as the level trol, had been called out by the production people at Olin. While Ralph was completing his check of the level trol's external parts (in a box which did not require entering any process equipment) Oatis, without any instruction to do so from the specialist on hand, loosened bolts on the level trol itself. Loosening the bolts allowed phosgene to escape. Oatis was not wearing his gas mask and inhaled the toxic fumes.
For assumption of the risk to be a successful defense it must be shown that the person assuming the risk fully understood and appreciated the magnitude of the risk and voluntarily exposed himself to it. The record supports such a finding. Oatis had attended safety meetings and knew of the nature of the chemicals, including phosgene, present in the TDI unit. While it is true Oatis had been issued a "safe work permit," which indicated the level trol had been decontaminated and was safe to work on, after arriving on site Oatis learned that decontamination procedures were still underway. Oatis cannot ignore the fact of danger and rely on this safe work permit to excuse his own actions.
Our review of the record convinces us that the jury was not clearly wrong in its conclusions that the injuries suffered by Oatis were not caused by a defective design by Catalytic.

JURY INSTRUCTIONS
Oatis urges that the trial court erred in its jury instructions in two respects. First, Oatis says the trial judge incorrectly told the jury that third party fault was a valid defense to a products liability action. Next, it is argued that the trial judge committed reversible error when he failed to instruct the jury that a person is presumed not to have exposed himself to a known risk and that, if a person's job requires him to be where he is, doing his duties, he cannot be held to have assumed the risk.
The first argument, regarding the instructions that third party fault can be a *334 defense, has some merit. In this case, if the instruction was erroneous, such an instruction was harmless error. The jury specifically found that no third party was the cause of Oatis' injury. The record amply supports this finding and Oatis was not prejudiced or placed under any greater burden because of this instruction. This argument cannot support a reversal of this case.
Concerning the failure of the trial judge to give the remaining specific instructions: adequate jury instructions are those which fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. Kaplan v. Missouri-Pacific R. Co., 409 So.2d 298 (La.App. 3rd Cir.1981). The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party. The trial judge must, however, correctly charge the jury. Our review of the jury charge in this case convinces us that the jury was properly instructed. After a review of the charges, we find no reversible error in the jury instructions.
For the foregoing reasons, the judgment of the trial court, in all parts, is affirmed. The costs of this appeal are to be borne by plaintiff, Melvin N. Oatis.
AFFIRMED.
NOTES
[1] Olin Corporation, Oatis' employer, and certain Olin executives were sued. These parties were dismissed after successfully urging exceptions of no cause of action based on the exclusivity of Oatis' remedy against Olin in workers' compensation. Olin has paid Oatis' medical bills and is currently paying Oatis benefits for permanent total disability; Olin has intervened seeking reimbursement of these amounts.